MARYVILLE PROPERTIES,
L.P., Appellant,

v.

Pat NELSON, Assessor, Nodaway
County, MO, Respondent.

No. WD 60335.

Missouri Court of Appeals,
Western District.

June 25, 2002.

Rehearing Denied July 25, 2002.

Application for Transfer Denied
Sept. 24, 2002.

Cathy Joy Pitman Dean, Kansas City, for appellant.

Scott W. Ross, Maryville, for respondent.

RONALD R. HOLLIGER, Judge.

Maryville Properties, L.P. (Maryville Properties) appeals from a decision of the State Tax Commission (Commission) including Low Income Housing Tax Credits (LIHTCs) received by Maryville Properties's limited partners in the valuation of a rent restricted apartment complex for real property tax purposes. Maryville Properties contends that 1) the tax credits and accelerated depreciation passed through to limited partners are intangible property not properly considered by statute in valuations for real estate tax assessments; 2) the Commission's decision violated the Missouri Constitution by valuing the property based upon the interest of the individual limited partners of Maryville Properties rather than the property's fair market value; and 3) the Commission arbitrarily deviated from its own prior decision that such tax credits were not properly included in valuing real property.

**Jurisdiction**

We must first address the issue of our jurisdiction because Article V, Section 3 of the Missouri Constitution grants exclusive appellate jurisdiction to the Missouri Supreme Court of all cases involving the constructions of revenue laws of the state. *Alumax Foils, Inc. v. City of St. Louis,* 939 S.W.2d 907, 910 (Mo. banc 1997). The Supreme Court does not have exclusive jurisdiction unless each of the three separate elements is met: 1) construction; 2) of the revenue laws; 3) of this state. "Construction" differs from "application," and if the Supreme Court has already decided an issue, the Court of Appeals applies the Supreme Court precedent. *Branson Scenic Ry. v. Dir. of Revenue,* 3 S.W.3d 788, 789 (Mo.App.1999). This case is one of first impression, and this court, therefore, has no Supreme Court precedent to apply. Construction is required. The law in question, however, is not a "revenue law of this state." We are required to interpret § 137.010, which defines, *inter alia,* two constitutionally mandated classifications of taxable property: real property and tangible personal property. Nevertheless, § 137.010 does not constitute a revenue law:

A "revenue law" directly creates or alters an income stream to the government that imposes a tax or fee on property owned or used or an activity undertaken in that government's area of authority. Thus, a revenue law either establishes or abolishes a tax or fee, changes the rate of an existing tax, broadens or narrows the base or activity against which a tax or fee is assessed, or excludes from or creates exceptions to an existing tax or fee. . . .

A revenue law "of the state" is a law adopted by the general assembly to impose, amend or abolish a tax or fee on all similarly-situated persons, properties, entities or activities in this state, *the proceeds of which are deposited in the state treasury.*

*Alumax Foils,* 939 S.W.2d at 910. (Emphasis added).

This court has previously held that cases involving property taxes imposed by a county and paid to the treasury of the county are not "revenue laws of this state."

*Two Pershing Square, L.P. v. Boley*, 981 S.W.2d 635, 638 (Mo.App.1998). This case does involve construction of a law adopted by the general assembly. The proceeds of the *ad valorem* tax on real property are deposited in the treasury of Nodaway County, rather than in the state treasury. None of the other issues involved are reserved for the exclusive jurisdiction of the Supreme Court. Jurisdiction, therefore, properly lies with this court. *Id.*

### Background of Rent Restricted Federal Housing and Low Income Housing Tax Credits

Since the 1930's, the federal government has utilized a number of approaches to provide higher quality and more affordable housing to lower income individuals and families. These efforts have ranged from government constructed and operated projects to various incentives for private investors to provide such housing. The FmHA Section 515 Program is intended to provide more affordable housing in rural areas to low to moderate income families and senior citizens by providing favorable long term financing to private developers. In return for this financing, the project owner restricts occupancy to qualified families and charges rent at rates set by FmHa.

The LIHTC program is intended to motivate private investment by providing income tax credits which directly offset the federal income tax obligation of the individual investor. The individual investors in the Maryville property received such income tax credits through the Missouri Housing Development Commission (MHDC), a state agency established pursuant to RSMo. § 215.020. This program also supplied state income tax credits to the investors.

According to the testimony, the individual investor is motivated solely by the tax benefits. The tax credits expire after ten years. The tax credits are "sold" to the individual investor on a discounted basis.

Maryville Properties developed the rent-restricted apartment complex in 1992. For the tax years 1997 and 1998, the assessor valued this property at $758,300. Maryville Properties contested that the actual value was $350,000.

The property is subject to FmHA Section 515, which means that the owner must restrict occupancy to low-income tenants and must comply with various regulations in return for a favorable interest rate. The limited partners of Maryville Properties also received federal income tax credits under the LIHTC Program as a result of their investment in the property.

After development, Maryville Properties syndicated the project. The syndication process consisted of Maryville Properties creating a limited partnership in which a company under its control was the general partner. It then sold the ninety-nine percent limited partnership interest to a consortium of investors for between $138,000 and $169,000. The project cost was $748,647, but after syndication the value was $898,437. At the hearing, Maryville Properties' appraiser, Mr. Blaylock, testified that he could not explain the $149,790 increase in value except by way of the money paid during syndication. This appraiser testified that the income tax credits were not part of the real property. Another appraiser, Robert Cowan, testified for the assessor. His estimation of the value of the property included "the value a taxpayer in a 39% tax bracket would pay for the property," and assumed that person would sell the property as soon as the tax credit expired. The assessor also included in the value of the property accelerated depreciation that the federal program allows to be passed through to each limited partner.

The hearing officer's decision included the value a person in a thirty-nine percent tax bracket would place on the tax credits and deductions. Maryville Properties appealed the hearing officer's decision, and the Commission denied review, adopting the hearing officer's decision as its own. Maryville Properties appealed to the Nodaway County Circuit Court, which affirmed the Commission's decision. This appeal follows. Other facts will be stated as the issues are considered.

## Analysis

■■■ We generally review the Commission's decision to determine whether it was supported by competent and substantial evidence on the record as a whole, whether it was arbitrary, capricious or unreasonable, or whether the Commission abused its discretion. *Evangelical Ret. Homes of Greater St. Louis, Inc. v. State Tax Comm'n of Mo.*, 669 S.W.2d 548, 552 (Mo. banc 1984). A reviewing court is not to substitute its opinion as to the value of a property for that of the Commission. *John Calvin Manor, Inc. v. Aylward*, 517 S.W.2d 59, 63 (Mo.1974). However, if the question involves the application of law to the facts, the reviewing court must weigh the evidence for itself and determine the facts accordingly. § 536.140(3). Maryville Properties argues that the Commission erroneously applied the law.

■■■ The Commission stated under Finding of Fact 13: "Tax credits run with the land. They are part of the real property." However, whether LIHTCs constitute real property or intangible personal property, and whether a valuation of property that includes an assumption that the owner would be in a thirty-nine percent tax bracket values the property according to the owner's interest in it are questions of law. "It is well-settled that administrative agency decisions based on the agen-

cy's interpretation of law are matters for the independent judgment of the reviewing court." *Morton v. Brenner*, 842 S.W.2d 538, 540 (Mo. banc 1992). (Internal citations omitted).

Maryville Properties raises three points on appeal. In its first point it argues that the Commission erroneously applied the law because the income tax benefits to the individual limited partners are not real property for the purposes of valuation for real estate tax purposes. In its second point, Maryville Properties claims that the inclusion of the tax benefits to the individual limited partners amounted to a violation of Article X, Section 4(a) of the Missouri Constitution prohibiting the classification of real property based on the owner's interest in the property. In its third point, Maryville Properties argues that the Commission failed to follow its own precedent in the valuation of a similar low-income housing project.

## Constitutional and Statutory Scheme

For ad valorem tax purposes there are three classes of property: (1) real property, (2) tangible personal property and (3) intangible personal property. Mo. Const. Art. X, § 4(a). Each class of property is defined by statute:

*Class One (Real Property)*

"Real property" includes land itself, whether laid out in town lots or otherwise, and all growing crops, buildings, structures, improvements and fixtures of whatever kind thereon ..."

*Class Two (Tangible Personal)*

"Tangible personal property" includes every tangible thing being the subject of ownership or part ownership whether animate or inanimate, other than money, and not forming part or parcel of real property as herein defined, but does not include household goods, furniture, wearing apparel and articles of personal

use and adornment, as defined by the state tax commission, owned and used by a person in his home or dwelling place.

*Class Three (Intangible Personal)*

"Intangible personal property," for the purpose of taxation, shall include all property other than real property and tangible personal property, as defined by this section;"

§ 137.010, RSMo.2000. The definitions and proper classification are important because the Missouri Constitution prohibits the inclusion of intangible personal property in real property values. Mo. Const. Art. 10, § 4(b).

### Are LIHTCs and Accelerated Depreciation Benefits received by the Owner Intangible Personal Property?

 Maryville Properties argues that Missouri law prohibits the taxation of intangible personal property as real property. § 137.010, RSMo. The parties agree that the classification of the tax benefits including LIHTCs provided to investors in subsidized low income housing is at issue. The parties do not agree on the proper test for intangible personal property. Maryville Properties states the test for intangibility as "property which has no intrinsic and marketable value, but is merely representative or evidence of value." *Norris v. Norris*, 731 S.W.2d 844, 845 (Mo. banc 1987).

*Norris* involved a probate court's determination that a testator's intent was clear when he used the term "tangible personal property." The court held that intangible personal property "is that which has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bond, promissory notes, and franchises." *Id.* at 845. The *Norris* court was comparing intangible personal property to tangible personal property. *Norris* does not discuss the classifications of property for tax purposes.

The assessor argues that the test for whether an item is tangible or intangible property is "whether the disputed value is appended to the property and, thus transferable with the property or is it independent of the property so that it either stays with the seller or dissipates upon sale." *Main Plaza First Plat v. Boley*, 1997 WL 49304, at *4 (Mo. State Tax Comm'n Feb. 6, 1997). Maryville Properties argues that *Main Plaza First Plat* concerned the abatement of a real property tax rather than an income tax credit and is, therefore, inapplicable.

The assessor argues that because LIHTCs are transferable only with the land, they constitute "transmissible value." Transmissible value is a concept discussed in several Tax Commission decisions. *Simon Property Group, L.P. v. Boley*, 1996 WL 600855 (Mo. State Tax Comm'n Oct. 17, 1996); *Main Plaza First Plat v. Boley*, 1997 WL 49304 (Mo. State Tax Comm'n Feb. 6, 1997); *John Hancock Mutual Life v. Stanton*, 1996 WL 663128 (Mo. State Tax Comm'n Nov. 14, 1996).

Commercial property is to be assessed at its "true value in money." § 137.115. In *Missouri Baptist Children's Home v. State Tax Commission*, 867 S.W.2d 510 (Mo. 1993), the court was presented with the question of whether a below market lease could be considered in determining the value in money of the property. The Tax Commission took the position that a long term below market lease should not be considered in determining the value of the property. The court said, "True value in money is the price which the property would bring from a willing buyer when offered for sale by a willing seller." *Id.* at 512. After considering positions taken by several states, the court concluded that

"[t]he more recent and better-reasoned approach is to authorize the assessing authority to utilize actual as well as potential income in determining true value." *Id.* The Commission, therefore, erred in refusing to consider the below market long term lease as reducing the value of the property because it did not comport with economic reality under the circumstances to use only potential rather than actual income in determining value. The court also observed that "[p]lacing a value on real property is not an exact science. When relying on the income capitalization method to determine value, the factfinder necessarily has some discretion to decide what weight will be given to actual rent, as opposed to potential market rent, in reaching its decision." *Id.* at 513. Despite the permissible discretion, the assessment should not "have the effect . . . of punishing the entrepreneur whose efforts created the environment for the market" and should not "ignore economic realities." *Id.*

In *Main Plaza First Plat,* the Commission held that the tax abatements allowed under the statute could be considered in assessing the value in part because they directly contributed to increase net operating income of the property and, thus, its fair market value in an income capitalization method of appraisal. 1997 WL 49304, at *5. The Commission argues that the LIHTCs at issue here run with the land like the tax abatements considered in *Main Plaza First Plat.* Maryville Properties responds that the LIHTCs do not affect the income of the property itself. Maryville Properties's argument, however, ignores the economic reality that the tax credits are in effect a substitute for the

income the investors will not receive from their investment as a result of normal operations.[1] Because of the low rate of return from operations, other incentives to potential investors are deemed necessary. The tax credits provide one of those incentives.

In a related argument, Maryville Properties asserts that the fallacy of including tax credits in the determination of value is further demonstrated by the need of the Commission to assume a thirty-nine percent tax bracket for the investor to determine the value. Maryville Properties is correct both that a potential investor may not be in that tax bracket and that, in addition, the upper bracket may change from time to time and correspondingly affect the economic value of the tax credit to the investor. However, we need not ignore economic reality and assume that a lower bracket investor would make this kind of investment.[2] Likewise, tax brackets may change but the valuation here is for the true value of the property on tax day 1997 and not at some future date when tax changes may affect the resale value of the credits and consequently that of the property. Somewhat more troublesome is the fact that the tax credits will have been fully taken in ten years (the record reflects sometime in 2002). The assessor did consider only the remaining credits available after the tax year in question. Presumably the property will have less value after the credits are exhausted than it did when credits were available. But the same phenomenon would occur where tax abatements ended as in *Main Plaza First Plat* (although in the case of tax abatements,

---

1. Investors are only allowed to receive eight percent of their initial investment per year. Often the return does not reach eight percent.

2. Even if such an investor were interested, he would prudently pay less for the tax credits because of the lesser benefit to him and would have to compete for the investment opportunity with a higher tax bracket investor to whom the credits were more valuable.

net operating income would decrease when full tax payments were being made). We also observe that a potential buyer would arguably not pay a Maryville Properties limited partner dollar-for-dollar for the tax credits. Like the original investor, most of a new investor's return on his investment would be in the form and value of the remaining tax credits rather than potential income from the project.[3] We cannot determine if the assessor's appraiser considered this factor, but, in any event, no argument is made in a point on appeal that the Commission erred in determining the fair market value of the tax credits.

All of the arguments made above are set forth by Maryville Properties in support of its contention that 1) it would be bad policy to include the tax credits, and 2) that the tax credits are simply not the kind of benefits particular to the land (as opposed to the owner) that can be considered part of the real estate under law.

Other states have also considered the inclusion or exclusion of LIHTCs in determining real property values. Many of the arguments for and against consideration of the credits and the various views of other states are set forth in "Fairness in Valuation of Low–Income Housing Tax Credit Properties: An Argument for Tax Exemption," Jonathan Pena, 11 AFFORDABLE HOUSING & COMMUNITY DEVELOPMENT LAW 53 (Fall 2001).[4] A contrary view is taken in "Another Ad Valorem View of Low–Income Housing Tax Credit Properties," Michael W. Collins, 67 APPRAISAL J. 306 (1999). Review of other states' decisions for precedential value in this area is difficult because of varying constitutional and legislative differences. The Tax Commission relied upon and the assessor cites to a

decision by the Washington Board of Tax Appeals, *Cascade Court Limited Partnership v. Noble,* BTA No. 49295 (Wash.1998). There, Washington State's equivalent of our Commission held that LIHTCs were properly considered in valuing real estate. However, the Washington Court of Appeals reversed the Board's decision, holding that "[t]ax credits are intangible personal property and thus are not subject to real property taxation." *Cascade Court Ltd. P'ship v. Noble,* 105 Wash.App. 563, 20 P.3d 997, 1002 (2001). The assessor and Commission also relied upon *Deerfield 95 Investor Associates v. Town of East Lyme,* 1999 WL 391099 (Conn.Super.Ct. May 26, 1999), which also held that LIHTCs could be considered in valuing the project. Maryville Properties points out, correctly, that the Connecticut court relied in part upon the subsequently reversed decision in *Cascade,* discussed above. More importantly, however, for our purposes is the finding in *Deerfield* that "LIHTCs, **although intangibles,** do have an effect on the valuation of real estate for assessment purposes...." *Id.* at *6. (emphasis added). LIHTCs are also described as intangible assets in Advisory Opinion 14 of the 2001 *Uniform Standards Professional Appraisal Practice.*

Although the assessor argues that intangible factors affecting the value of real estate should be included in the valuation, he apparently agrees that intangible personal property is not includible in the value of real estate. The assessor points to no foreign case holding that these types of tax credits are not intangibles. Rather, the assessor suggests that LIHTCs do not pass the test for intangibility set forth by the Commission in *Simon Property Group.*

---

3. Although the tax credits are exhausted after ten years the rent limitations and other restrictions on the property last for a term of fifty years.

4. Cases holding for particular states should be verified because of the effect of subsequent judicial decisions in some states and legislation addressing the issue in others.

He suggests that the test is (1) the intangible asset must be identifiable, i.e. legally recognized; (2) it must be capable of private ownership; (3) it must be marketable, i.e. capable of being financed and/or sold separate and apart from the tangible property; and (4) practically, it must possess value, i.e. have the potential to earn income, or its existence is of no consequence. The assessor's argument about this test focuses entirely on the non-severability of the tax credit from the land under the reasoning for tax abatements used in *One Main Plaza First Plat.* The assessor's brief does not discuss the other elements of the test.

First, we do not believe that transferability alone is a sufficient test, although it is certainly a significant factor. We believe that another important factor is the potential to add or detract from the value of the property, i.e. to affect the income of the property. Below market leases and tax abatements have direct effects on the income of a property. LIHTCs do not. And although they would appear to add value to a property, the literature dealing with these projects suggests that most prudent investors will stay in the project for fifteen years.[5]

Secondly, because the original limited partner investor achieves much of his return through the tax credits, his rate of return is sharply reduced if he sells the property before receiving the full value of tax credits. This is particularly significant when considering that, while some tax credits remain, a potential purchaser of the investor's interest will likewise be looking for a discount from face value of the unused tax credits.

Finally, after the fifteenth year the investment may not be viable at all for the limited partner investor. This fact is recognized by the owner's right to return the property to the government at his will and without recourse after ten years. All of these factors result in a situation where there is little incentive to sell until the tax credits are exhausted and not subject to recapture, and there is little incentive to buy the interest of the partner unless it can be done at a substantial discount. The value of the tax credits is to the owner of the property and not to the property itself.

It is difficult to construct a satisfactory definition of intangible property for real estate valuation purposes, but certain important distinctions can be made. The assessor argues that zoning and location are intangible and yet they are obviously proper factors for consideration. Zoning and location, however, are characteristics of the property itself, not characteristics of the owners of the property. Likewise, just as with a below market lease or a tax abatement, zoning and location have a direct effect on the income or income producing potential of the property regardless of the identity or characteristics of the individual owner. LIHTCs are not characteristics of the property. Rather they are assets having direct monetary value. Their restricted transferability does not destroy their essential status as intangible property having value primarily to their owner. Objective standards should be used for determining fair market value in the market place. The particular circumstances of the owner are not a proper consideration. Even in *Deerfield*, which approved the use of LIHTCs in valuation, the court noted the difference in the con-

---

5. The tax credits are taken over a ten year period. However, if a subsequent purchase in year fourteen changed the use of the property, the tax credits would then be subject to recapture plus penalties even though the beneficiary of the credit no longer had any interest in the property.

cepts of "investment value" and "market value." "Investment value is the value of a property to a particular investor, whereas market value is not related to the needs of individual investors but 'is objective, impersonal, and detached; investment value is based on subjective, personal parameters.'" 1999 WL 391099, at *2 (quoting in part The Appraisal Institute, *The Appraisal of Real Estate* 413 (10th ed.1992)).

■ True value in money for ad valorem tax purposes in Missouri refers to the hypothetical price that could be agreed upon between a willing seller and buyer. *Baptist Children's Home,* 867 S.W.2d at 512. LIHTCs make no direct contribution to the market value of these housing projects. They are intangible property. There is no statutory authority for the consideration of these tax credits in real estate tax appraisal in Missouri. The Commission erroneously applied the law.

■ The same reasoning compels that we reverse the Commission's inclusion of the capitalized value of the accelerated depreciation to the partners in the valuation. Again, this tax benefit is personal to the owner and not directly tied to the real estate.

For the reasons stated, the decision of the Commission is reversed and remanded to the circuit court for entry of an order directing the Commission to redetermine its assessment of the Maryville property in accordance with this opinion.

HAROLD L. LOWENSTEIN, Presiding Judge, and THOMAS H. NEWTON, Judge, concur.